UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HANNAH WULK,<br><br>　　　　　　　　　*Plaintiff*,<br><br>v.<br><br>NEW YORK MEDICAL COLLEGE SCHOOL OF MEDICINE,<br><br>　　　　　　　　　*Defendant*. | Civil Action No.: 24-7845<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Hannah Wulk, through her attorneys, Eisenberg & Baum, LLP, states her Complaint against Defendant New York Medical College School of Medicine ("Defendant" or the "College") as follows:

### INTRODUCTION

1. This lawsuit arises out of New York Medical College's unlawful discrimination against and distressing mistreatment of Ms. Hannah Wulk, a dedicated and accomplished medical student, on the basis of her disabilities. Academic institutions, including the College, are charged with fostering the success of their students, regardless of disability status, and providing appropriate support to do so. Despite these obligations, the College dismissed Ms. Wulk in violation of federal, state, and city laws protecting students with disabilities.

2. Ms. Wulk matriculated into the College's School of Medicine in the fall of 2018, choosing the institution due to its long-standing reputation, its location near New York City, and its offer of an academic scholarship. She selected the College despite having no prior personal or professional connections to the Northeast, opting for the path of greatest resistance in order to challenge herself and become the best physician possible.

3. While Ms. Wulk faced setbacks in her academic career, she approached these challenges openly, advocating for improvements within the school and community as part of her commitment to medicine and psychiatry. External hardships, including being ostracized from her peers and living in isolation during her first winter in upstate New York, where she experienced power outages, water issues, and other distressing conditions, compounded these academic difficulties. Despite these challenges, Ms. Wulk remained committed to her education and career goals.

4. On January 24, 2023, the College dismissed Ms. Wulk. But for her disabilities, she would not have been dismissed, as she had demonstrated the dedication, intelligence, and passion necessary to succeed in the medical field. With appropriate accommodations, Ms. Wulk's disabilities have never impeded her ability to care for patients; in fact, her lived experience as a disabled person enhances her ability to provide compassionate and empathetic care. The College's decision to dismiss her not only devastated Ms. Wulk's career but also deprived the medical community of a valuable future doctor.

5. Ms. Wulk now faces significant financial and emotional harm, including insurmountable debt and the humiliation of being unable to fulfill her lifelong dream of becoming a practicing physician. Following her dismissal, she was forced to move into her father's home, which was already under financial strain. Her maternal relatives—many of whom are educators or physicians—have largely distanced themselves from her, expressing feelings of shame and embarrassment over her dismissal. These external pressures have compounded Ms. Wulk's pre-existing struggles with financial instability, humiliation, and profound grief over the loss of her career aspirations. The College dismissed her on the basis of her disabilities after allowing her to invest over five of her life, as well as substantial tuition costs, into the program.

6. As a result of the College's discriminatory actions, Ms. Wulk brings this lawsuit to compel the College to cease its unlawful practices and implement policies that protect students with disabilities from discrimination. She seeks re-admittance to New York Medical College's School of Medicine or, alternatively, a compassionate off-ramp, which offers students the ability to transfer with advanced standing to a terminal master's degree in addition to compensatory damages to her potential career earnings without her medical degree. Additionally, Ms. Wulk seeks declaratory, injunctive, and equitable relief; compensatory damages; attorney's fees and costs; and all other remedies available under Title III of the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12181, *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Rehab Act"). 29 U.S.C. § 794., New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290, *et seq.*., and Article 4 of the New York Civil Rights Law ("NYCRL") § 40, *et seq*.

## PARTIES

7. Plaintiff Hannah Wulk brings this action and is currently an individual residing in Florida. Ms. Wulk is a qualified individual with disabilities under federal, state, and city anti-discrimination laws. She matriculated in the New York Medical College School of Medicine in the fall of 2018.

8. Defendant New York Medical College School of Medicine is and was at all relevant times a New York corporation with its principal place of business at 40 Sunshine Cottage Rd, Valhalla, NY 10595. Defendant has a registered address for service at c/o Administration Building, Sunshine Cottage, Valhalla, NY, United States, 10595.

9. Upon information and belief, Defendant is a recipient of federal financial assistance.

3

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction for the federal-law claims under 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States. This Court also has supplemental jurisdiction for the city- and state-law claims under 28 U.S.C. § 1367 because those claims are substantially related to the federal-law claims.

11. Venue is proper in this District under 28 U.S.C. § 1391(b) because, among other things, Defendant resides in this District, and the acts and omissions giving rise to this Complaint occurred in this District.

## STATEMENT OF FACTS

12. Ms. Wulk is professionally diagnosed with Bipolar 2 Disorder, Generalized Anxiety Disorder, and Attention Deficit Disorder, Combined Type. She also has a permanent hand injury that will affect her for the rest of her life.

13. Thus, Ms. Wulk is a qualified individual with disabilities under city, state, and federal law.

14. During her time at the College, Ms. Wulk established a strong record of service and leadership within extracurricular activities, including the NYMC Wellness Committee, Psychiatry Interest Group, Resiliency Committee, Student Lunch Panel Volunteer, M1 Student Representative for the OBGYN Interest Group, and STEM mentorship community.

15. Later in her education, feedback on Ms. Wulk's work across several practice areas—Family Medicine, Psychiatry, and OBGYN, to name a few—included that she is "[w]ell-organized, accurate, and problem-based." Her supervisors praised her "effective and advanced communication skills" and ability to "adapt[] communication style to individual patients' needs."

During her M3 year, Ms. Wulk honored in her first rotation, psychiatry, and high-passed her second rotation in family medicine.

16. Ms. Wulk's transition into medical school, however, was not without its hardships.

17. Ms. Wulk matriculated into Defendant's School of Medicine in the fall of 2018.

18. Her first semester was challenging but successful, as she passed both core courses.

19. Like many medical students facing the notoriously difficult first year of their education, Ms. Wulk struggled with Biochemistry and Physiology in the winter semester of 2019. Despite her efforts, including seeking advice from faculty, she ultimately failed both courses by a margin of only 1-3 points.

20. During this time, Ms. Wulk was also contending with her pre-existing mental health issues.

21. In January 2022, Ms. Wulk's difficulties were compounded when she experienced a traumatic car accident that severely injured her hand.

22. Because the accident occurred mere weeks before her Step 1 exam—a notoriously challenging standardized test taken by medical students—it necessitated that Ms. Wulk take a leave of absence from the College beginning in January 2022.

23. Determined to achieve enough hand functionality to fulfill her dream of becoming a doctor, Ms. Wulk underwent extensive treatment for her hand injuries, including two surgeries on her dominant hand to reconstruct her wrist with metal plates and screws.

24. During this time, Ms. Wulk's medical team informed her that she may never be able to click a pen again.

25. The College sent Ms. Wulk an email containing a link to its policies regarding participation in the MD program for students with motor disabilities. The policy clearly stated that students who do not have full motor function would not be eligible to complete the program.

26. Upon receiving this information, Ms. Wulk, who had limited motor function in her right hand, was devastated. The realization that she might be disqualified from the program triggered a severe panic attack, leading to her being admitted to the psychiatric department after an ER visit.

27. While hospitalized, Ms. Wulk remained determined. She spent her time preparing for Step 1 and rigorously performing hand rehabilitation exercises.

28. Defying expectations, she made a remarkable recovery, with her doctor reporting a 90–99% restoration of her hand's motor function given the extent of the injuries she had.

29. In the fall of 2023, she returned to the College, more committed than ever to achieving her goal of becoming a medical professional.

30. Upon returning to the College, Ms. Wulk made a formal accommodations request to facilitate her once-weekly psychotherapy sessions and exam accommodations.

31. The College approved this accommodation request.

32. During her OBGYN rotation, the clinical coordinator emailed Ms. Wulk's entire resident team, disclosing her weekly medical appointments.

33. Ms. Wulk had not consented to the College sharing information about her accommodations with her colleagues.

34. The College's disclosure embarrassed Ms. Wulk and subjected her to frequent, uncomfortable questions from her colleagues regarding her accommodations and medical diagnoses.

35. Faculty members also regularly inquired about her accommodations and diagnoses, placing Ms. Wulk in situations where she felt obligated to respond. For instance, during her internal medicine rotation, an attending physician pulled her into a private room, assuring her that patient confidentiality would be respected due to the physician's ethical and moral obligations. The attending asked why Ms. Wulk appeared so anxious, and Ms. Wulk explained that the school's repeated threats of dismissal were causing her extreme anxiety, affecting her ability to focus. The College later cited this conversation as an example of inappropriate boundaries with attending physicians, contributing to her dismissal.

36. Due to the nonconsensual disclosure of her medical information and the subsequent scrutiny from her colleagues, Ms. Wulk requested to transfer her OBGYN rotation to a different location, where her coworkers would not have improper access to her private medical accommodations.

37. The College denied her request.

38. As a result of this ongoing humiliation and embarrassment, Ms. Wulk's medical conditions worsened, significantly impacting her performance, including intermittent academic struggles and attendance issues.

39. To address her worsening condition, Ms. Wulk's doctor adjusted her medication. However, this caused further difficulties with attendance during her OBGYN clerkship in the fall of 2023.

40. In response, Ms. Wulk's doctor submitted a letter to the College, explaining the connection between her medication adjustments and her attendance challenges and clearly establishing that her behavior was related to her disability.

41. During the fall 2023 semester, Ms. Wulk unintentionally took an additional personal day. She misunderstood the College's policy, which allows one personal day per semester rather than two per academic year.

42. Upon realizing the error, Ms. Wulk offered solutions to remediate this understandable mistake, including a proposed Zoom session to compensate for the hours and completing any missed assignments.

43. At this time, Ms. Wulk submitted "anonymous" feedback regarding her negative experience on the OBGYN rotation.

44. The College, which solicits this feedback on its website, states that "[g]ood faith reports" made using the anonymous form "will not jeopardize employment or academic standing."[1]

45. However, soon after Ms. Wulk submitted this feedback report, she was referred to the College's Professional and Integrity Committee ("PIC") due to "professionalism issues."

46. After referring Ms. Wulk to the PIC, the College continued to express concern about broad "professionalism issues."

47. In a letter dated November 27, 2023, the College informed Ms. Wulk that its Year Three/Four Promotions Committee determined that she should be dismissed from the School of Medicine, a decision affirmed by Dr. Jane M. Ponterio, Dean of Students, in a January 24, 2024, email, and again by Dr. Neil W. Schluger in a March 1, 2024, email.

48. In the letter dated November 27, 2023, the College attributes its decision to dismiss Ms. Wulk to a "demonstrated lack of behavioral attitudes necessary to work with colleagues,

---

[1] https://www.nymc.edu/departments/administrative-departments/general-counsel/institutional-compliance/reporting-compliance-concerns/.

faculty, and staff, to participate in teamwork and to care for patients," claiming this has been part of Ms. Wulk's behavior since her matriculation at NYMC.

49. However, the College's documentation of Ms. Wulk fails to meaningfully consider her extensive documentation of both her disabilities' influence on her performance and her steps toward improvement.

50. The College's documentation of Ms. Wulk also holds her to a different standard than other medical students on the basis of her disabilities.

51. For example, College policy states that students may retake up to two National Board of Medical Examiners tests each academic year.

52. Ms. Wulk only failed one such test—the OBGYN National Board of Medical Examiners test in October 2023—and sought to remediate it.

53. The College denied this request.

54. Importantly, Ms. Wulk had repeatedly alerted the College of the psychological disabilities she was facing at the time of this exam.

55. Upon information and belief, the College knew or should have known of Ms. Wulk's psychological disabilities and taken the appropriate steps to accommodate her needs as a student.

56. However, the College remained firm in their denial of Ms. Wulk's request to retake the exam.

57. Most distressingly, the College then cited Ms. Wulk's failure of the OBGYN National Board of Medical Examiners test as one of the reasons the College decided to pursue Ms. Wulk's dismissal.

58. In addition, following her hand injury, Ms. Wulk was physically sent a "link" to the College's policy regarding motor dysfunctions, which explicitly stated that students could not participate in the program without fully functioning motor capacity.

59. Ms. Wulk was told she only had one attempt to "take and pass" Step 1, whereas the school's bylaws state otherwise regarding Step 1 attempts. Further, many students at the school have explicitly stated they have taken Step 1 numerous times.

60. The College kept attempting to force Ms. Wulk to take the exam with her right hand incapacitated (e.g., in surgeries, in a cast) to which she had to spend the majority of her time filing for accommodations with United States Medical Licensing Examination ("USMLE") to physically be able to attempt the exam without an operating right hand (e.g., extended time to click with her left hand/a trackpad to avoid being disoriented by using her non-dominant hand).

61. The College is aware that the National Board of Medical Examiners granted Ms. Wulk accommodations for the USMLE Step 1.

62. Based solely on issues arising from her disability, Ms. Wulk was dismissed from the College, a detriment to her career and education.

63. Concerningly, Ms. Wulk's dismissal from the College has harmed her medical opportunities irreparably.

64. Ms. Wulk applied to and was considered for the majority of top Caribbean schools and transfer into other U.S. M.D. schools.

65. As part of her application, these schools requested that Ms. Wulk provide a dean's letter from the College explaining her dismissal.

66. The College denied Ms. Wulk's request for a dean's letter.

67. As a result, Ms. Wulk was denied from these institutions because she could not provide a dean's letter from the College.

68. Because of her expulsion and lack of a dean's letter, Ms. Wulk can no longer gain admittance to an accredited medical school, causing irreparable harm to her career prospects and financial wellbeing.

69. Ms. Wulk submitted a complaint to the United States Department of Education Office of Civil Rights in early 2023. This complaint is still pending.

70. Defendant has treated Ms. Wulk differently than other medical students on the basis of her disabilities, providing her unequal access to its programs and services.

71. By discriminating against Ms. Wulk on the basis of her disabilities, the College denied her full and equal enjoyment of its programs and services.

72. The College repeatedly and intentionally discriminated against Ms. Wulk on the basis of her disabilities, acting with deliberate indifference throughout both the provision of accommodations and its dismissal proceedings.

73. The College deliberately discriminated against Ms. Wulk by failing to make reasonable modifications in its policies, practices, and procedures.

74. The College knew or should have known of its obligations under federal, state, and city anti-discrimination laws to develop policies to promote compliance with these statutes and to provide reasonable accommodations.

75. Because of the College's discrimination and failure to accommodate Ms. Wulk's disabilities, Ms. Wulk has suffered from embarrassment, violation of her civil rights, emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, and irreparable damage to her reputation and career prospects as she faces dismissal from the College.

## CAUSES OF ACTION

### CLAIM I: Violations of Title III of the Americans with Disabilities Act

76. Ms. Wulk incorporates by reference all preceding paragraphs and realleges them in support of this claim.

77. At all times relevant to this action, Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, has been in full force and effect and has applied to Defendant's conduct.

78. At all times relevant to this action, Ms. Wulk has been a qualified individual with a disability within the meaning of the ADA. 42 U.S.C. § 12102(2).

79. Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

80. Title III of the ADA further provides that "[i]t shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(b)(1)(A)(ii).

81. Defendant discriminated against Ms. Wulk on the basis of her disability in violation of Title III of the ADA and its implementing regulations.

82. Defendant has failed to implement policies, procedures, and training of staff necessary to ensure compliance with Title III of the ADA and its implementing regulations.

83. Ms. Wulk is entitled to injunctive relief, as well as damages and an award of attorney's fees, costs, and disbursements under the ADA. 42 U.S.C. § 12188(a)(1)–(2); 42 U.S.C. § 2000a-

3.

## CLAIM II: Violations of Section 504 of the Rehabilitation Act

84. Plaintiff repeats and re-alleges all preceding paragraphs in support of this claim.

85. At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, has been in full force and effect and has applied to Defendant's conduct.

86. At all times relevant to this action, Plaintiff has been an individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9).

87. At all times relevant to this action, Defendant has been a program or activity receiving federal financial assistance pursuant to 29 U.S.C. § 794(b).

88. Pursuant to Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

89. Defendant has discriminated and continues to discriminate against Plaintiff solely on the basis of her disability by denying her meaningful access to the services, programs, and benefits Defendant offers to other individuals, and by refusing equal treatment and access, in violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794.

90. The Rehabilitation Act explicitly authorizes the remedies available under 42 U.S.C. § 1981a. Specifically, 29 U.S.C. § 794a(a)(2) provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

91. Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000e-5(e)(3), which in turn states: "In addition to any relief authorized by section 1981a of this title . . . an aggrieved person may obtain [other] relief . . . ." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

92. As such, "*any person aggrieved* by any act or failure to act by any recipient of Federal Assistance . . . under section 794" is entitled to the "remedies, procedures, and rights" not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

93. The statutory text of 42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

94. Plaintiff is also entitled to other forms of compensatory damages beyond emotional-distress damages because Defendants are subject to remedies traditionally available in suits for breach of contract. "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts § 347 cmt. A (Am. L. Inst. 1981). Here, as a student of the College, Ms. Wulk expected that she would participate in the College's programs and activities without incident, ultimately obtaining her medical degree.

95. Accordingly, Plaintiff had an expectation interest in the ability to fully participate in Defendant's educational services and denied Plaintiff this expectation interest by denying her full

14

and equal enjoyment of its programs and services. Accordingly, Plaintiff should be entitled to compensatory damages under her expectation interest.

96. Thus, Plaintiff seeks nominal, compensatory damages, and all remedies available under contract law as set forth above, and attorneys' fees, costs, and disbursements for the injuries and loss she sustained as a result of Defendant's discriminatory conduct and deliberate indifference as alleged under 29 U.S.C. §794a.

97. Plaintiff is therefore entitled to compensatory damages, injunctive relief, and an award of attorney's fees, costs, and disbursements, pursuant to 29 U.S.C. § 794(a).

## COUNT III: Violations of The New York State Human Rights Law

98. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

99. At all times relevant to this action, New York State Numan Rights Law ("NYSHRL"), N.Y. Exec. L. § 290, *et seq.*, has been in full force and effect and has applied to Defendant's conduct.

100. At all times relevant to this action, Plaintiff has had a physical, mental, or medical impairment resulting from anatomical, physiological, genetic, or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or a record of such an impairment or a condition regarded by others as such an impairment and is an individual within the meaning of the NYSHRL, N.Y. Exec. L. § 292(21).

101. Defendant owns, leases, and/or operates a place of public accommodation within the meaning of the NYSHRL, N.Y. Exec. L. § 292(9).

102. The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of . . . disability . . . directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . or that the patronage or custom threat of any person of or purporting to . . . having a disability is unwelcome, objectionable or not acceptable, desired, or solicited." N.Y. Exec L. § 296(2)(a).

103. The NYSHRL defines "discriminatory practice" as including "a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities, unless such person can demonstrate that making such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations." N.Y. Exec. Law § 296(2)(c)(i).

104. 58. The NYSHRL further defines discriminatory practice as "a refusal to take such steps as may be necessary to ensure that no individual with a disability is excluded or denied services because of the absence of auxiliary aids and services, unless such person can demonstrate that taking such steps would fundamentally alter the nature of the facility, privilege, advantage or accommodation being offered or would result in an undue burden." N.Y. Exec. Law § 296(2)(c)(ii).

105. Defendant discriminated against Plaintiff on the basis of disability, in violation of the NYSHRL, as set forth above.

106. Plaintiff is therefore entitled to monetary damages and injunctive relief pursuant to the NYSHRL, N.Y. Exec. Law. § 297(9).

### COUNT IV: Violations of The New York Civil Rights Law

107. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

108. At all times relevant to this action, the New York Civil Rights Law, Article 4 of the New York Civil Rights Law § 40, *et seq.*, has been in full force and effect and has applied to Defendant's conduct.

109. At all times relevant to this action, Plaintiff has been a qualified individual with a disability within the meaning of New York Civil Rights Law § 40, *et seq.*

110. The New York Civil Rights Law prohibits discrimination on the basis of disability, as contemplated by the NYSHRL. *See* N.Y. Civ. Rights L. §§ 40-c &40-d; N.Y. Exec L. § 296(2).

111. As set forth above, Defendant discriminated against Plaintiff on the basis of her disability in violation of the NYCRL.

112. Based on Defendant's discrimination against Plaintiff, Defendant is liable "for each and every violation" of "a penalty of not less than one hundred dollars nor more than five hundred dollars." N.Y. Civ. Rights L. § 40-d.

113. "At or before the commencement of [this] action under this section," notice was provided to the New York Attorney General. N.Y. Civ. Rights L. § 40-d.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Hannah Wulk respectfully requests that this Court:

A. Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have subjected Plaintiff to unlawful discrimination in violation of Title III of the ADA, the RA, the New York State Human Rights Law, and New York Civil Rights Law.

    B.    Enjoin Defendant from implementing or enforcing any policy, procedure, or practice that discriminates against students with disabilities;

    C.    Enjoin Defendant from engaging in any further acts of discrimination, harassment, or retaliation against Plaintiff or any other student with disabilities;

    D.    Order Defendant:

        i.    to develop, implement, promulgate, and comply with a policy prohibiting future discrimination against Plaintiff or other disabled individuals;

        ii.    to develop, implement, promulgate, and comply with a policy to ensure that Defendant will notify students with disabilities of their right to accommodation;

        iii.    to develop, implement, promulgate, and comply with a policy to ensure that Defendant will reasonably accommodate students with disabilities;

        iv.    to train all its employees, staff, and other agents about the rights of students with disabilities under the ADA, RA, NYSHRL, and NYCRL.

    E.    Award to Plaintiff:

        i.    Re-admittance to New York Medical College's School of Medicine or, alternatively, a compassionate off-ramp or, alternatively, a tailored degree program, such as a Master's degree;

        ii.    Compensatory damages pursuant to the RA, the New York State Human Rights Law, and New York Civil Rights Law;

        iii.    Reasonable costs and attorneys' fees pursuant to the ADA, the RA, the New York State Human Rights Law, and New York Civil Rights Law;

  iv. Interest on all amounts at the highest rates and from the earliest dates allowed by law;

  v. Any and all other relief that this Court finds necessary and appropriate.

Dated: October 16, 2024        Respectfully submitted,

                  _____
                  David John Hommel
                  **EISENBERG & BAUM, LLP**
                  24 Union Square East, PH
                  New York, NY 10003
                  (212) 353-8700
                  dhommel@eandblaw.com
                  *Attorneys for Plaintiff*